UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| PRO PREMIUM FINANCE COMPANY, INC; DANIEL GLANTZ & TONY PEREZ<br><br>*Plaintiffs*,<br><br>v.<br><br>US PREMIUM FINANCE SERVICE COMPANY, LLC<br><br>*Defendants*. | COMPLAINT |

Plaintiffs Pro Premium Finance Company, Inc., Daniel Glantz and Tony Perez file this Complaint for damages, rescission and declaratory relief against Defendant US Premium Finance Service Company, LLC and in support state as follows:

## NATURE OF THE ACTION

1. This action arises out of the sale of Pro Premium Finance ("PPF").

2. One of PPF's largest clients perpetrated a massive, multi-million dollar fraud, which left PPF in a financially distressed position and set off an unfortunate chain of events.

3. At the time of the fraud, PPF had a credit facility in excess of $50 million with Bank United. Bank United immediately terminated the facility and then sued PPF for default.

1

4. Subsequently, PPF's assets were acquired by US Premium Finance Service Company ("USPF"). As consideration for its assets, USPF agreed to fund all new business moving forward and consider hiring certain PPF employees.

5. Prior to the sale, USPF and its principal repeatedly and in specific terms represented to PPF, Glantz and Perez that if the sale went through, PPF's business would then continue forward post-sale substantially unchanged. These representations turned out to be entirely false.

6. As a condition of the sale, USPF also agreed that post-sale it would not use any of PPF's collateral to fund new premiums and would instead use its own capital. USPF breached this condition of the sale, using millions of dollar of PPF's collateral to fund new business. As such, USPF reaped the benefit of – in effect – a multi-million dollar interest free loan, paid for at the expense of PPF, Glantz and Perez.

7. This is an action to rescind the sale agreement and employment agreements of Glantz and Perez, declare restrictive covenants contained in all USPF employment agreements at issue void and unenforceable, and recover damages from USPF stemming from its fraud and breach of contract.

## PARTIES

8. PPF is an insurance premium finance company. PPF maintains its principal place of business at 5012 Hollywood Blvd. #200, Hollywood, FL 33021.

9. Daniel Glantz is a citizen of Florida. Until October 2015, Glantz was the President and co-owner of PPF. Glantz has 28 years of experience in the insurance premium finance industry.

10. Tony Perez is a citizen of Florida. Perez has 21 years of experience in the insurance premium finance industry, all of them with PPF.

11. US Premium Finance Service Company, LLC ("USPF") is a company with its principal place of business located at 3169 Holcomb Bridge Rd., Ste. 150, Norcross, GA 30071. On information and belief, USPF is wholly owned by The Brand Banking Company, a Georgia bank with its principal place of business located at 106 E. Crogan St., Lawrenceville, GA 30046. As such, for purposes of diversity, USPF is a citizen of Georgia.

## JURISDICTION

12. This is an action between citizens of different states. Plaintiffs are citizens of Florida. Defendant is a citizen of Georgia.

13. The matter in controversy exceeds the sum of $75,000 exclusive of interest, attorneys' fees and costs.

14. Subject matter jurisdiction exists under Title 28 U.S.C. §1332(a).

15. Defendant is subject to personal jurisdiction in the State of Florida in that it conducted business in the state of Florida, including engaging in the acts that give rise to this litigation within the state of Florida.

16. Venue is proper under 28 U.S.C. § 1391(b)(1) because the Defendant is deemed to reside in this district for the purposes of venue. Further, the acts complained of took place within this District and Division.

## GENERAL ALLEGATIONS

17. PPF is an insurance premium finance company that was founded in 1987 by Daniel Glantz and his brother Michael Glantz.

18. PPF provides insurance premium financing for both businesses and consumers that are unable to remit payment in full for their insurance premiums at the time such premiums are due.

19. At least 90% of PPF's business involves commercial rather than personal insurance polices.

20. PPF provides financing for all classes of property and casualty insurance.

21. Premiums can range anywhere from $750 to $2 million. The average premium PPF finances is between $4,000 and $5,000.

22. PPF acquires its business through independent insurance agents.

23. When a client wishes to finance a commercial insurance premium, these agents generally solicit quotes for financing from multiple premium finance companies in order to provide their clients with competitive offers.

24. When a client accepts premium financing from PPF, the insurance agent generates a premium financing agreement that is then signed by the client.

25. Once the client executes a premium finance agreement, the agent submits that agreement to PPF for processing. PPF immediately remits funding to the respective insurance carrier. Approximately thirty days later, the client begins repaying the loan in monthly installments.

26. For the past twenty years, PPF has obtained its primary source of funds through asset-based loans from institutional lenders.

27. Most recently, PPF had a credit facility with Bank United that exceeded $50 million.

**Insurance Agency Fraud**

28. In approximately late July of 2015, PPF was alerted to a potential fraud involving one of its largest clients.

29. At this point in time, PPF had receivables of approximately $70 million. The client at issue was responsible for approximately $20 million of those receivables.

30. Upon uncovering this potential fraud, PPF advised Bank United of these developments.

31. On September 15, 2015, Bank United ceased to fund PPF's credit facility, ostensibly as a response to PPF's discovery of this fraud. Shortly thereafter, Bank United declared PPF in default under the terms of its loan agreement. Subsequently, Bank United sued PPF for default.

32. Given the time-sensitive nature of PPF's business and the termination of the Bank United credit facility, PPF immediately was placed in a dire situation.

33. Unable to reach a deal with Bank United that would allow it to continue its operations, PPF was left with no option but to sell the business.

34. Working through a business broker, PPF came into contact with US Premium Finance, a division of BrandBank out of Georgia.

35. In early October 2015, PPF engaged in extensive discussions and negotiations with USPF regarding USPF's acquisition of PPF's assets.

36. These discussions and negotiations were held principally between William Villari, President of USPF and Glantz and Perez of PPF.

37. During the course of these discussions, USPF – acting through Villari – repeatedly represented to PPF, Glantz and Perez that if PPF agreed to be sold to USPF, then following the sale, PPF's business model would continue forward unchanged.

38. USPF represented to Plaintiffs that the company would continue to operate under the PPF brand to ensure continuity.

39. USPF represented to Plaintiffs that PPF would operate within USPF as its own autonomous entity.

40. USPF represented to Plaintiffs that PPF would not be required to change its business model with respect to the manner in which PPF funded loans.

41. USPF represented to Plaintiffs that PPF would not be required to change its operating platform.

42. USPF represented to Plaintiffs that all new business (i.e. new premium financing) would be funded with USPF's own collateral and not with PPF's collateral.

43. USPF represented to Plaintiffs that their commission programs for referring agents would not change.

44. USPF made certain representations to Glantz and Perez regarding their earning potential as employees of USPF. Those representations were based on the assumption that nothing in PPF's business model would change.

45. USPF was aware of the falsity of each of these representations and also aware of Plaintiffs' reliance on these representations.

## The Asset Purchase Agreement

46. On October 12, 2015, in reliance on the USPF's misrepresentations, PPF executed an Asset Purchase Agreement ("APA") selling certain assets to USPF. *See* Exhibit A.

47. Under the APA, USPF paid no money acquire PPF. Instead, the consideration paid to PPF was USPF agreement to fund all new business moving forward and potentially hire on certain PPF employees.

48. The APA incorporated by reference a court order appointing a receiver entered by the court in the litigation between Bank United and PPF.

49. Via that incorporation, that APA provided that after the consummation of the deal, USPF would be responsible for funding all new business (i.e. new premiums) with its own funds and would under no circumstances use PPF's collateral to finance new premiums. *See* Exhibit A at p. 28.

50. The APA contains no restrictive covenants.

## The Employment Agreements

51. On October 14, 2015, in reliance on USPF's misrepresentations, Glantz and Perez executed employment agreements with USPF titled Master Agreement. *See* Exhibit B.

52. The Master Agreements contain broad restrictive covenants that prohibit Glantz and Perez from working in the industry in any manner whatsoever for a period of two years following their separation from USPF.

53. The restrictive covenants contained in the Master Agreements purport that they are not tied to the sale of PPF but instead are tied solely to employment with USPF.

54. By their own terms, the restrictive covenants purport to protect against Glantz and Perez working for USPF, acquiring special knowledge, expertise and relationships and then leaving USPF and unfairly utilizing that special knowledge and expertise and those relationships to unfairly compete against USPF.

## Post-Sale Changes

55. Following the execution of the APA and the Master Agreements, PPF continued to operate as usual. In late October, everything changed.

56. During the final week of October, USPF acting through Villari and USPF's Executive Vice President Neal Dunoff began demanding numerous operational changes.

57. These demands directly contradicted USPF's pre-sale representations that nothing about the PPF business model would change.

58. USPF demanded that PPF immediately begin to process all new business through USPF's management platform, which is vastly different than PPF's old management platform.

59. This change required several hundred referring insurance agents to immediately switch to the new USPF platform.

60. USPF placed William Villari, Neal Dunoff and Matthew Essery in charge of all PPF operations.

61. USPF then implemented changes to the processing of new loans

62. Historically, PPF processed new incoming loans as of they day they were received provided they were received prior to 4pm EST.

63. Upon receiving a completed loan application from the agent, the loan was considered active and PPF would immediately fund the respective insurance company for the amount of the premium financed.

64. USPF terminated PPF's authority to process new loans.

65. Under the new USPF regime, although loans were quoted by PPF, those loans were processed by USPF out of their Norcross, GA location.

66. Contrary to PPF's historical practices, USPF no longer activated loans upon receipt.

67. Even once loans were made active, USPF would not immediately fund those loans.

68. USPF implemented a standard policy of not funding loans for at least 15 days after the later of the processing date or the effective policy date.

69. This change represented a dramatic departure from PPF's standard practice of immediately funding loans and immediately began to cause difficulties with referring agents.

70. Only after numerous complaints by referring agents and pressure from Glantz and Perez did USPF agree to modify its policy to call for funding within 5 days of activation.

71. USPF began refusing to process (and fund) loans that would have been funded under the old PPF practices.

72. For instance, USPF began not processing agreements that were missing basic information such as a phone number.

73. Under the old PPF practices, PPF would have processed the loan and obtained any missing (but non-essential) information in due course.

74. Under the USPF regime, USPF simply does not process such loans.

75. Only weeks into the new USPF regime, Plaintiffs discovered that USPF's failure to process and fund certain fully executed loans had created the possibility of insurance policies lapsing for several insured, which in turn could potentially give rise to tremendous exposure.

76. USPF began to refuse certain types of business that had long been a major part of PPF's model.

77. In effect, USPF changed PPF's core business model from a focus on average premiums of $4,000 to $5,000 to a focus on premiums that are multiple times these dollar amounts.

78. In light of this change in focus, USPF has reduced the level of customer service provided to referring agents that refer policies where the average premium financed is less than $10,000.

79. USPF has treated these agents – and this entire market segment – as dispensable, when in fact this market segment made up the vast majority of PPF's business pre-sale.

80. Once again, this led to difficulties with agents who had done business with PPF for many years.

## The Aftermath

81. Since late October 2015, USPF has fundamentally altered the PPF business model.

82. These changes directly contradict USPF's pre-sale representations that the PPF business model would remain unchanged.

83. These changes have damaged PPF's reputation in the premium finance industry and harmed PPF's profitability moving forward.

84. This damage to PPF's profitability directly impacts the compensation of Glantz and Perez whose compensation is substantially tied to PPF's performance.

85. In addition to damaging PPF's profitability and standing in the industry, USPF has used PPF's collateral in a manner that violated the APA and allowed USPF to reap a windfall.

86. The APA incorporated the terms of the October 9th, Order.

87. By virtue of this incorporation, the APA provided that post-sale, all new business (i.e. new insurance premiums) would be funded with USPF's collateral.

88. The APA explicitly provided that under no circumstances would USPF use PPF's collateral to fund new insurance premiums.

89. Post-sale, USPF used several million dollars of PPF's collateral to fund certain new loans.

90. USPF used this collateral in violation of the APA and effectively used this money as an interest free loan to conduct its new business.

91. In diverting PPF's collateral to new business, in violation of the APA, USPF prevented PPF from using this collateral to pay down its financial obligations to Bank United (among others), thereby causing PPF to accrue hundreds of thousands of dollars worth of additional interest.

92. Given USPF's fraudulent conduct, the damage USPF caused to PPF's brand and USPF's breaches of this APA, it is impossible for PPF, Glantz and Perez to continue forward in any relationship with USPF.

**COUNT I – RESCISSION OF ASSET PURCHASE AGREEMENT AND MASTER AGREEMENTS**

93. Plaintiffs repeat and reallege the foregoing as if fully set forth herein.

94. In its acquisition of PPF, USPF represented to Plaintiffs that the nature of PPF's business would not change.

95. USPF represented to Plaintiffs that the company would continue to operate under the PPF brand to ensure continuity.

96. USPF represented to Plaintiffs that PPF would operate within USPF as its own autonomous entity.

97. USPF represented to Plaintiffs that PPF would not be required to change its business model with respect to the manner in which PPF funded loans.

98. USPF represented to Plaintiffs that PPF would not be required to change its operating platform.

99. USPF represented to Plaintiffs that all new business (i.e. new premium financing) would be funded with USPF's own collateral and not with PPF's collateral.

100. All of the foregoing representations alleged in this Count I turned out to be false.

101. USPF was aware of its own misrepresentations and Plaintiffs' reliance on those misrepresentations.

102. But for Plaintiffs' understanding that the nature of the PPF business model would not changed, based on USPF's representations to that effect, Plaintiffs would not have agreed to the terms of either the APA or the Master Agreements.

## COUNT II
## FRAUD IN THE INDUCEMENT

103. Plaintiffs repeat and reallege the foregoing paragraphs 1 through 91 as if fully set forth herein.

104. In its acquisition of PPF, USPF misrepresented to Plaintiffs that the nature of PPF's business would not change.

105. USPF misrepresented to Plaintiffs that the company would continue to operate under the PPF brand to ensure continuity.

106. USPF misrepresented to Plaintiffs that PPF would operate within USPF as its own autonomous entity within USPF.

107. USPF misrepresented to Plaintiffs that PPF would not be required to change its business model with respect to the manner in which PPF funded loans.

108. USPF misrepresented to Plaintiffs that PPF would not be required to change its operating platform.

109. USPF misrepresented to Plaintiffs that all new business (i.e. new premium financing) would be funded with USPF's own collateral and not with PPF's collateral.

110. These misrepresentations relate to facts that were highly material to the PPF business and to Plaintiffs' decision to accept both the APA and the Master Agreements.

111. USPF was aware of its own misrepresentations and made such representations to induce Plaintiffs to enter both the APA and the Master Agreements.

112. As a result of Plaintiffs reliance on USPF's misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT III
## BREACH OF CONTRACT

113. Plaintiffs repeat and reallege the foregoing paragraphs 1 through 91 as if fully set forth herein.

114. The APA incorporated the terms of the October 9th Order.

115. By virtue of this incorporation, the APA provided that post-sale, all new business (i.e. new insurance premiums) would be funded with USPF's collateral.

116. The APA explicitly provided that under no circumstances would USPF use PPF's collateral to fund new insurance premiums.

117. Post-sale, USPF used several million dollars of PPF's collateral to fund certain new loans.

118. USPF used this collateral in violation of the APA and effectively used this money as an interest free loan to conduct its new business.

119. In diverting PPF's collateral to new business in violation of the APA, USPF prevented PPF from using this collateral to pay down its financial obligations to Bank United (among others), thereby causing PPF to accrue hundreds of thousands of dollars worth of additional interest.

120.    As a result of USPF's breaches of the APA, Plaintiff PPF has been damaged in an amount to be determined at trial.

## COUNT IV
### DECLARATORY JUDGMENT THAT RESTRICTIVE COVENANTS CONTAINED IN THE MASTER AGREEMENTS ARE VOID DUE TO FRAUD

121.    Plaintiffs repeat and reallege the foregoing paragraphs 1 through 91 as if fully set forth herein.

122.    In acquiring PPF, USPF made numerous fraudulent representations to PPF, Glantz and Perez regarding the manner in which PPF would operate post-sale.

123.    In reliance on these representations, Glantz, Perez and certain other PPF employees executed the Master Agreements.

124.    Post-sale, USPF dramatically changed PPF's operations to the detriment of PPF, Glantz and Perez.

125.    Because USPF fraudulently induced Glantz, Perez and others to enter the Master Agreements, the restrictive covenants contained in those agreements are void and unenforceable.

126.    A dispute exists between USPF and Glantz and USPF and Perez regarding the validity and enforceability of the restrictive covenants contained in the Master Agreements.

127.    The controversy involves the legal relation of the parties, having adverse interests with respect to which the declaration is sought.

128.    Accordingly, there exists an actual, practical and present need for a declaration pursuant to 28 USC § 2201.

129.     Therefore, Plaintiffs seek a declaration by this Court that the Master Agreements and the restrictive covenants contained therein are void and unenforceable under Fla. Stat. § 542.335.

**COUNT V**
**DECLARATORY JUDGMENT THAT RESTRICTIVE COVENANTS CONTAINED IN THE MASTER AGREEMENTS ARE UNENFORCEABLE FOR LACK OF A LEGITIMATE BUSINESS INTEREST**

130.     Plaintiffs repeat and reallege the foregoing paragraphs 1 through 91 as if fully set forth herein.

131.     The Master Agreements contain certain broad restrictive covenants that would prohibit Glantz and Perez from working in the industry in any capacity for two years following their separation from USPF.

132.     The restrictive covenants contained in the Master Agreements are tied solely to employment with USPF.

133.     By their own terms, the restrictive covenants purport to protect against Glantz and Perez working for USPF, acquiring special knowledge, expertise and relationships and then leaving USPF and unfairly utilizing that special knowledge and expertise and those relationships to unfairly compete against USPF.

134.     The restrictive covenants contained in the Master Agreements are not reasonably necessary to protect any legitimate business interest.

135.     After signing the Master Agreements, Glantz and Perez did not become employees of USPF until October 22nd and October 31st, 2015, respectively.  As such, Glantz and Perez have been employed by USPF for approximately two months.

136. During their limited two month tenure with USPF, neither Glantz nor Perez has acquired any valuable confidential information that belongs to USPF, received any extraordinary training or formed any substantial relationships with USPF's clients.

137. In addition to Glantz and Perez, certain other PPF employees signed copies of the Master Agreement but were not scheduled to begin work for USPF until December 31st, and in fact never began working for USPF on that date.

138. These employees include Joel Sansone, Ken Baron, Loren Vanhuelven and John Impellizeri.

139. Glantz and Perez desire to separate from USPF at this time and pursue other ventures.

140. The restrictive covenants contained in the Master Agreements are not reasonably necessary to protect any legitimate business interest.

141. A dispute exists between USPF and Glantz and USPF and Perez regarding the validity and enforceability of the restrictive covenants contained in the Master Agreements.

142. The controversy involves the legal relation of the parties, having adverse interests with respect to which the declaration is sought.

143. Accordingly, there exists an actual, practical and present need for a declaration pursuant to 28 USC § 2201.

144. Therefore, Plaintiffs seek a declaration by this Court that the restrictive covenants contained therein are unenforceable under Fla. Stat. § 542.335.

## **CONCLUSION**

WHEREFORE, Plaintiffs demand judgment against Defendants on all Counts and requests:

a. Compensatory damages to compensate PPF for damage resulting from USPF's fraudulent conduct and breaches of the APA;

b. Punitive damages for defendants wrongful conduct;

c. Rescission of the APA and Master Agreements;

d. A declaration holding that the Master Agreements are void in their entirety because of USPF's fraudulent conduct;

e. A declaration holding that the restrictive covenants contained in the Master Agreements are unenforceable against Glantz, Perez and any PPF employees that signed the Master Agreements but never began working for USPF for lack of a legitimate business interest.

f. An award of attorneys fees and costs;

g. Such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all claims so triable.

Dated:  January 4, 2016                                Respectfully submitted,

By: s/ *Jonathan Pollard*

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Nathan M. Saunders
Florida Bar No.: 107753
nsaunders@pollardllc.com

Pollard PLLC
401 E. Las Olas Blvd. #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731

*Attorneys for Plaintiffs*